No. 25,840.

C. A. McCormick, Trustee in Bankruptcy, *Appellee*, v. Agnes M. Engstrom et al., Bankrupts, *Appellants*.

SYLLABUS BY THE COURT.

Wills—*Renunciation—Bankruptcy—Fraudulent Transfers.* Where a testator devised a life estate in land to his widow and the remainder to three sons and a daughter, and about the time the will was probated one of the sons wrote the probate judge that he wanted his mother to have all the property left by his father and for that reason he would not take any property willed to him, and no record of such letter was preserved and no action taken in the probate court thereon, and the letter itself was lost or missing from the files of the court, and neither the mother nor anybody else was advised that such a letter had been written for some fourteen years thereafter, at which time the son had become insolvent and executed in favor of his mother a quitclaim deed of his interest in the land devised by his father, without consideration, for the mere purpose of making it easier for the mother to transfer the property in case she found a buyer, it is held that the letter to the probate court was not an unequivocal and unconditional renunciation of the son's interest in the property, and that the quitclaim deed executed by him fourteen years later, when he had become insolvent, was in fraud of the rights of his creditors and was properly set aside.

Appeal from Smith district court; William R. Mitchell, judge. Opinion filed December 5, 1925. Affirmed.

*A. W. Relihan, T. D. Relihan* and *J. T. Reed,* all of Smith Center, for the appellants.

*F. W. Mahin, H. D. Mahin, E. S. Rice* and *W. S. Rice,* all of Smith Center, for the appellee.

Wills, 40 Cyc. p. 1899; 19 L. R. A., n. s., 595; 27 A. L. R. 472; 28 R. C. L. 352 *et seq.*

The opinion of the court was delivered by

DAWSON, J.: This was an action by a federal trustee in bankruptcy to subject the interest of M. S. Engstrom, bankrupt, in a half section of land to the satisfaction of his debts. Engstrom held an undivided one-fourth interest in the remainder estate devised by his father, who had died in 1907, unless that interest had been effectively disposed of by M. S. Engstrom prior to his insolvency, and that question depends upon the proper legal significance to be given to the following facts:

On January 24, 1907, C. J. Engstrom died seized of 320 acres of Smith county land, a life estate in which he devised to his wife, Agnes M. Engstrom, and the remainder he devised to M. S. Engstrom and two brothers and a sister, share and share alike. The will of C. J. Engstrom was admitted to probate on February 21, 1907; and shortly afterwards M. S. Engstrom wrote a letter to the probate judge expressing his desire that his mother should have all his father's property, and for that reason he would not accept any of it for himself. This letter was received by the probate judge and was afterwards mislaid or lost from the files of the probate court, but M. S. Engstrom testified that its contents were substantially these:

*"Probate Judge, Smith Center, Kansas:*

"DEAR SIR—I want my mother to have all of the property my father, C. J. Engstrom, left, to do what she wants to with; for that reason I won't take any property willed to me by father.        M. S. ENGSTROM."

No action was taken by the probate court upon this letter, and neither Agnes M. Engstrom, the mother, nor any other person knew of its existence for some fourteen years after it had been written. M. S. Engstrom testified:

"I absolutely never told anybody about having written the letter to probate judge until this suit came up, as I figured it was nobody's business."

In the years 1919, 1920 and 1921, M. S. Engstrom became heavily indebted to the Claudel State Bank, and for some months of 1921 he was insolvent. In October of that year he joined his brothers and sister in executing a quitclaim deed of all the undivided interests of the remaindermen in their father's estate to their mother, Agnes M. Engstrom. He testified that he did not read the deed at the time he signed it and that he received nothing for his share; that his mother had called him to Kensington and asked him to sign

it so that it would be easier to transfer in case she found a buyer, but that she had found no buyer as yet. "Never had any other conversation with my mother about deed."

Issues were formed, pursuant to which the foregoing facts were developed. The trial court made findings of fact, some of which read:

"4. That the defendant, M. S. Engstrom, wanted his mother to have the entire property of the father, and for that reason decided not to take any property under his father's will, and he so informed the probate court of Smith county, Kansas, by a letter, about the time of admitting the will to probate. This letter was delivered to the probate court or the judge thereof, but there is no evidence in this case showing that it was made a matter of record in the office of the probate court, and this court does not so find. . . . .

"6. That the defendant, M. S. Engstrom, borrowed additional money from the Claudel State Bank until in 1921, said indebtedness amounted to $6,300.

"7. The defendant about the first of November, 1921, . . . paid to the Claudel State Bank, on indebtedness to the bank at the time, about $2,200, leaving an indebtedness to the bank at that time of about $4,100. . . .

"9. That in October, 1921, a quitclaim deed was executed by the defendant, M. S. Engstrom, and his brothers and sister, to his mother, Agnes M. Engstrom, conveying their interest in all of the land described under the will of C. J. Engstrom, deceased, . . . and which was without consideration.

"10. That at the time of the execution of said quitclaim deed and for some months prior thereto, the defendant, M. S. Engstrom, was insolvent, if he had no interest or property rights in the property described in said quitclaim deed.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"11. That at the time of the making of the last loans by the Claudel State Bank to the defendant, M. S. Engstrom, the officers of said bank believed that he had an interest in the land described in the will of his father, C. J. Engstrom. . . .

"15. Agnes M. Engstrom had no knowledge that M. S. Engstrom had by any act or deed attempted to relinquish his interest in his father's estate until a short time prior to the execution of the quitclaim deed in question in this suit, in 1921.

"16. That the moving motive that prompted the defendant, M. S. Engstrom, to send the letter to the probate judge of Smith county, Kansas, mentioned in finding No. 4, and in executing the quitclaim deed in question in this suit, was that he wanted his mother, Agnes M. Engstrom, to have the property left by his father at his death."

The trial court concluded, as a matter of law, that the execution of the quitclaim deed, so far as it purported to convey any interest of M. S. Engstrom to his mother, was in fraud upon the Claudel State Bank and it was set aside.

Defendants appeal, urging the sufficiency of the lost letter of

M. S. Engstrom written to the probate court in 1907 to serve as a renunciation of the interest devised to him by his father's will.

Let us assume for the nonce that this contention is correct. Then what would become of that interest—an undivided one-fourth share of the remainder estate of C. J. Engstrom? A partial intestacy, to be sure (*Tea v. Millen*, 257 Ill. 624, 45 L. R. A., n. s., 1163), unless there was a residuary clause in the will. (*Albany Hospital v. Albany Guardian Society*, 214 N. Y. 435.) Here, if the renunciation had been effective, the resulting intestate estate of C. J. Engstrom would descend according to the statute of descents and distributions, which would produce this result: One-half of the undivided one-fourth interest in the remainder estate would descend to Agnes M. Engstrom, which would be one-eighth thereof; and one-fourth of the other one-eighth interest therein, being one-thirty-second thereof, would descend to each of the four children of C. J. Engstrom, one of whom would be the renouncing son himself! So if the renunciation were effective the interest devised to M. S. Engstrom would not pass to his mother according to his intention expressed in his letter to the probate judge, nor would his letter contribute in the slightest degree to vest "all of the property" of C. J. Engstrom in Agnes M. Engstrom. Such a result would vitiate the purpose of M. S. Engstrom expressed in his letter to the probate judge. Nor would it be a fair interpretation of the lost letter to say that it was effective as a renunciation whether it resulted in a vesting of M. S. Engstrom's interest in his mother or not. The purpose of M. S. Engstrom in writing that letter was that his mother should have all his father's property.

The law is settled that to be effective a renunciation of a testamentary devise or bequest must be express, clear and unequivocal (40 Cyc. 1898), and the devisee may not so far assume dominion over it as to dictate to whom it should go in the event of his renunciation. Such an exercise of dominion and dictation would be virtually an acceptance rather than a renunciation. In *Wonsetler v. Wonsetler*, 23 Pa. Sup. Ct. 321, two brothers had a lawsuit over a clock bequeathed to the one by their mother and claimed by the other through purchase from the mother in her lifetime. The defendant brother who claimed the clock by purchase had received a bequest of a bureau by the same will, and the point was made that he could not take anything under the will and at the same time

attack the bequest to his brother. Defendant contended that he had never accepted the bequest of the bureau, but there was some evidence tending to prove that he had directed that the bureau be delivered to his wife. The superior court reversed the judgment of the trial court, saying:

"The evidence in relation to the defendant's acceptance of the bureau bequeathed to him was properly submitted to the jury. In determining the question, both the language and the conduct of the defendant are to be considered. While the bequest vested the title in him, his refusal to accept would leave it part of the testator's residuary estate. But the refusal must be absolute and unqualified, not merely in word but in deed. However positive the terms of refusal, they may be made ineffective by conduct inconsistent with a refusal, such as acts of dominion over the property. A gift of it to another is unquestionably such an act, since it is only by virtue of the bequest that it can be thus disposed of. The true interpretation of the defendant's language and conduct in the premises was for the jury." (p. 325.)

In *Burritt against Silliman*, 13 N. Y. (3 Kernan) 93, 97, the requisites and consequences of renunciation were considered, and some of the older cases analyzed thus:

"In *Crewe v. Dicken*, 4 Ves. 97, a trustee, who had executed a deed of release to his cotrustees instead of disclaiming, was held to have thereby accepted the estate; and the chancellor on that ground refused to compel a purchaser to take the conveyance of the other trustees, to whom the release had been executed, unless the trustee who had released would join in the receipt for the purchase money. Lord Eldon afterwards, in *Niclosen v. Wordsworth*, 2 Swanst. 387, thought this case rather an overrefinement, and that a release, intended as a disclaimer, might well enough in equity be deemed to operate only as a disclaimer; but his argument shows that a disclaimer was not supposed to have any effect as a conveyance of an estate, it having neither parties to whom the estate should pass, nor words of conveyance. In *Townson v. Tickell*, 3 B. & Ald. 31, the question arose whether a devisee in fee could disclaim by deed, it being contended that a disclaimer in a court of record could alone suffice to defeat the estate. All the judges rejected this doctrine and held that the disclaimer by deed was sufficient. This was held, not upon the ground that the deed of disclaimer operated as a conveyance, but that it was a solemn instrument asserting the disagreement of the party. Holroyd, J., says: 'The law presumes that a devisee will assent until the contrary be proved; when the contrary, however, is proved, it shows that he never did assent to the devise, and consequently that the estate never was in him. I cannot think that it is necessary for a party to go through the form of disclaiming in a court of record, nor that he should be at the trouble or expense of executing a deed to show that he did not assent to the devise.' These authorities render it clear that a disclaimer does not operate as a conveyance; and there is, therefore, no necessity that it should be executed with those forms which are necessary to pass an estate in land."

In the late case of *Estate of Johnston*, 186 Wis. 599, the supreme court of Wisconsin had to consider the legal significance which attached to a writing executed by Robert S. Johnston, one of the heirs of Ellen A. Johnston. It read:

"I, Robert S. Johnston, . . . . of my own accord and freely, entirely abdicate and renounce whatsoever things to me, even unaware, may have come or may have been able to come, or could in the future come, whether by right of legacy, or donation or profit. This, my entire abdication, I make in favor of Marquette College, in the city of Milwaukee, in the state of Wisconsin. And these things I wish to be understood according to the spirit of the constitutions of the Society of Jesus, which I have already embraced as a mother and which I will cherish through all days to come.

"Given at Milwaukee, in Marquette College, on the fourteenth day of August, in the year one thousand nine hundred and nine.

"ROBERT S. JOHNSTON, S. J."

"(Duly attested by three witnesses.)"

It was held that this instrument was not a renunciation but an assignment. The court said:

"'Renunciation' is defined by the Century Dictionary as 'a legal act by which a person abandons a right acquired, but without transferring it to another.' The term 'abdication' is defined as 'The act of abdicating; the giving up of an office, power or authority, right of trust, etc., renunciation.' So that it would appear that the terms 'renunciation' and 'abdication' as used in the instrument of Robert S. Johnston are synonymous. Robert S. Johnston, however, did not merely abdicate or renounce his rights to any property, but he abdicated and renounced in favor of Marquette College. So that, construing these terms as used by him, they in legal effect amount to an assignment. The college, if it derives anything under the instrument executed by Robert S. Johnston, obtains it through that portion of the instrument in which any interest coming to him from the estate of his mother is renounced and abdicated in favor of the college." (p. 377.)

Of course a mere mistake of law on the part of M. S. Engstrom as to the legal effect of his renunciation of the devise—its resultant devolution under the statute of descents—would not defeat that renunciation; but the contents of the lost letter, as well as the testimony of M. S. Engstrom himself, with no evidence to the contrary, fully justified the trial court's finding of fact (No. 16), and show clearly it was only to give effect to his intention that his mother should have all his father's property that M. S. Engstrom wrote the letter to the probate judge. The letter could not be given that legal effect, and there was no unequivocal renunciation, no unconditional disclaimer by M. S. Engstrom of the interest devised to him.

It follows that the quitclaim deed executed fourteen years later,

after M. S. Engstrom had become insolvent, conveying to his mother, without consideration, the interest in his father's estate devised to him, and executed, also, for the mere purpose, as he deposed, of making it "easier to transfer in case she found a buyer," was in fraud of the rights of his creditors, and the judgment of the trial court was correct.

The judgment is affirmed.